UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RODNEY S. SINK

                         Plaintiff,

v.

CAROLYN COLVIN

                         Defendant.

_____

**REPORT AND RECOMMENDATION**

12-CV-00239(T)(M)

        This case was referred to me to hear and report in accordance with 28 U.S.C.

§636(b)(1)(B) [6][1]. Before me is the plaintiff's motion for judgment on the pleadings [7] as well as

the defendant's cross-motion for judgment on the pleadings [14] pursuant to Fed. R. Civ. P.

("Rule") 12(c).   For the following reasons, I recommend that defendant's motion for judgment on

the pleadings be granted, and that plaintiff's motion be denied.

        Pursuant to 42 U.S.C. §405(g), plaintiff seeks review of the final decision of the

Commissioner[2] of Social Security denying his application for Supplemental Security Income

("SSI") [1].   Plaintiff filed his application on May 27, 2008 (T130).[3]   This claim was initially

denied on September 5, 2008 (T74).   A hearing on the claim was conducted before

Administrative Law Judge ("ALJ") David S. Pang on July 23, 2010 (T29).   Plaintiff was

represented at the hearing by Amanda Jordan, Esq. (T29, 75).   On July 30, 2010, ALJ Pang issued

a decision denying plaintiff's claim (T14-24).   The ALJ's determination became the final decision

---

[1]  Bracketed citations refer to the CM/ECF docket entries.
[2]  Carolyn W. Colvin has replaced Michael J. Astrue as the Commissioner of Social Security. She therefore is
automatically substituted as the defendant in this action pursuant to Rule 25(d) (1) of the Federal Rules of Civil
Procedure.
[3]  References to "T" are to the certified transcript of the administrative record.

of the Commissioner on January 25, 2012, when the Appeals Council denied plaintiff's request for review (T1-3).

Plaintiff requests that the Commissioner's decision be reversed, with this Court making a finding that plaintiff is entitled to Social Security Disability Benefits and Supplemental Security Income benefits. Complaint, [1], p.2 at ¶ 1.[4]   In the alternative, he requests that the matter be remanded to the Social Security Administration for further proceedings, including "reasonable efforts to obtain a medical opinion" of residual functional capacity ("RFC"). Plaintiff's Memorandum of Law [7-1], pp.14-15, 19.

Defendant cross-moves for judgment on the pleadings [14], and requests that the Court affirm his decision that the plaintiff was not disabled within the meaning of the Social Security Act. Commissioner's Memorandum of Law [15], p.26.

## FACTUAL BACKGROUND

Plaintiff's application for SSI benefits (T133) alleged a disability onset date of March 1, 2008 (T131). He claimed that depression and anxiety limited his ability to work (id.), and that he could not lift because of his right shoulder (T150).[5]   Around the time of his alleged onset

---

[4] I am treating the request for a finding with respect to entitlement to Social Security Disability benefits, contained in the "wherefore" clause of plaintiff's Complaint ([1], p.2 at ¶ 1), as a typographical error for the following reasons. First, plaintiff's Notice of Motion [7] only addresses Disability Insurance Benefits. I additionally note that Plaintiff invokes the jurisdiction of this Court under 42 U.S.C. §§405(g) and 1383(c)(3) for purposes of obtaining a review of "a decision of the Commissioner of Social Security denying Plaintiff's application for Supplemental Security Income benefits" only. Complaint, [1], p.1 at ¶ 1. The decision appealed from and attached to the Complaint concerned an application for SSI made on May 27, 2008. See Exhibit "A" to the Complaint, [1], p. 7. A prior decision of February 29, 2008, which denied disability benefits, does appear in the record (T62-68). The record does not reflect that plaintiff timely requested review of that particular decision by the Appeals Council, as required by 20 C.F.R. §404.968, nor does it reflect that the decision became final by virtue of a denial of review of that decision by the Appeals Council. Under these circumstances, this Court would not have jurisdiction with respect to plaintiff's claims for disability benefits, since it does not appear that his action with respect to such denial was commenced within sixty days of any final decision by the Commissioner.   See 42 U.S.C. §405(g); 20 C.F.R. §§405.501, 404.900.

[5] Plaintiff had had arthroscopic surgery in November of 2006, with labral repair, removal of loose bodies, chondroplasty, and debridement. (T221).

2

date,[6] plaintiff was experiencing osteoarthritis in the shoulder (T220, 219) for which he was receiving injections.

During the pendency of plaintiff's SSI application, plaintiff also alleged disability due to gastroesophageal reflux disease ("GERD") in addition to his depression, anxiety, and shoulder condition. (T188). Medical records reviewed by ALJ Pang (T16) revealed that plaintiff also had carpal tunnel syndrome, chronic obstructive pulmonary disease ("COPD"), hypertension, and obesity.

ALJ Pang determined that plaintiff's GERD, hypertension, and obesity were not severe impairments: plaintiff's GERD and hypertension were controlled with medication, and plaintiff's body mass index fluctuated in and out of the obese range (T16 at ¶ 2). Plaintiff has not challenged these determinations in this action. *See, generally*, Plaintiff's Memorandum of Law [7-1].

A discussion of the impairments ALJ Pang considered to be severe follows.

## Depression and Anxiety

Plaintiff has a history of anxiety and depression predating the alleged onset date. Medical records from August of 2007 indicate that he was being treated for anxiety and depression at that time, and the record reflects that plaintiff was evaluated for disability as a result of depressive or affective and anxiety disorders in 2004. (T64). In 2008 Plaintiff saw Dr. Abdul Syed, a psychiatrist at Lake Shore Behavioral Health, who noted past psychiatric treatment occurring in the late 1990's, and between 2004 and 2006. (T236). Plaintiff has never been hospitalized for his psychiatric complaints. (T240).

---

[6] I.e., between November 28, 2007 and April 2, 2008.

**Plaintiff's Descriptions of Depression and Anxiety**

At his July 23, 2010 hearing, plaintiff testified that sometimes he does not want to go out of his room, he stays in bed, and neglects his personal hygiene (T39). This was improved, however, since he had been "clean"[7] and received emotional support from his mother and grandmother (T40). Plaintiff also claimed that, at events or shopping, "I get heart racing, sweating, panicky" (T39). He did not trust people, feeling that they judge him, try to hurt him, or would want to hurt him. (id.). When asked how he felt about people, his response was "I don't know. They suck, I guess" (T41).

In the Adult Function Report plaintiff completed in support of his disability application, he reported that he slept "a lot sometimes more than 10 hours a day" as a result of his condition. (T146). He denied problems with personal hygiene or care (id.), although he stated that he would occasionally need reminders (T147). He reported a "lack of interest in all activities" since his conditions began (T149). He also reported problems with remembering appointments, dates, and phone numbers, and some difficulty with understanding written and spoken instructions. (T151). Plaintiff further alleged that he could not finish projects or chores he starts. (id.). He claimed that he did not get along with neighbors, family, or others, that he did not respect authority, and that he had "anger issues" (T150-51). He reported having lost a job because he argued with supervisors or co-workers (T152). His self-reported reaction to stress was that it "makes me angry then I become [a] recluse" (id.).

Plaintiff has reported to his treating physicians symptoms of anxiety and depression. As of August 14, 2007, plaintiff reported to his gastroenterologist, Dr. Robillard, that

---

[7]  I.e., not using drugs or alcohol. When asked about drugs and alcohol earlier in his testimony, Plaintiff had testified that he had been "clean" for about a year. (T37).

4

he had had some improvement with respect to his anxiety and depression (T200). On April 9, 2008 he reported depression that lasts three to four days followed by alleged[8] elated mood (T238). On December 17, 2009 he complained that he was "[s]uper anxious all the time", thought that people were watching him, and that he watches his neighbors, and that he had trouble going out in public, but otherwise felt much better with his depression medication. His treating physicians' reports consistently reference his generalized complaints of anxiety and depression. *See, e.g.,* Exhibit 17F (T309-37); Exhibit 18F (T338-58).

Additionally, he reported specific symptoms of panic attacks to Psychiatric[9] Examiner ("PE") Thomas Ryan, Ph.D. (T240-243) and the ALJ (T39) within the context of his SSI application. Plaintiff reported, to the PE, "panic attacks with palpitations and sweating" that occur when he thinks about other people perceived to be "out to get me" (T240). He testified before the ALJ that "I've been at events . . . and I have to get out of there, I get heart racing, sweating, panicky" (T39).

### Medical and Psychiatric Professionals' Observations

Medical and psychiatric providers' observations concerning depression-related symptoms and plaintiff's appearance follow.

In January of 2008, plaintiff contacted Lakeshore Behavioral Health for individual therapy (T231). He reported having had mood swings and weeks-long depression with symptoms[10] of apathy, lack of motivation, and weight gain (id.). At the time of the intake assessment, plaintiff was talkative and engaged in conversation (T232), although he spoke with

---

[8] Although plaintiff described having an elated mood, it did not, according to the examining doctor, meet the criteria for a manic episode (T238).
[9] Although the report is designated a "Psychiatric Evaluation", the examiner is referenced as a psychologist.
[10] Plaintiff also complained of anxiety-related symptoms and problems with social interactions (T231-35). These are discussed below.

little emotion, and occasionally in a delayed manner. (T233).

Plaintiff was also evaluated by Psychiatrist Abdul Hakeem Syed, MD through Lakeshore Behavioral Health[11] in April of 2008. (T236-38). During his evaluation, Dr. Syed noted that plaintiff was alert and cooperative with good eye contact. (T237). Plaintiff's short and long term memory, as well as concentration, were normal, and his mood was noted as "okay" (id.). Plaintiff was unable to answer some basic mathematical and geographic questions, leading the doctor to observe that plaintiff may have below-average intelligence. (id.).

Plaintiff was next evaluated in August of 2008 by PE Dr. Ryan. (T240-43). During the mental status examination, plaintiff's mood was depressed and he appeared dysthymic. (T241). His eye contact was poor. (id.). He was once again cooperative, however, and his "[m]anner of relating, social skills, and presentation [were] adequate" (id.). Plaintiff complained of difficulty with memory, attention, and concentration (id.). On examination his attention and concentration were intact, although his memory was mildly impaired. (T242). Cognitively, plaintiff was found to have a somewhat limited general fund of knowledge, and appeared to be "in the low average range" (T242).

When examined by his treating orthopedist, Dr. Paterson, on January 23, 2009, for his right shoulder complaints, plaintiff complained of depression and anxiety, but the doctor observed "no depress, anxiety, or agitation" with respect to mood and affect on his mental status examination of the plaintiff. (T341).

On a later appointment with Dr. Paterson, on October 12, 2009, within the context of an elbow examination, he reported that he had headaches, memory loss, anxiety, and

---

[11] Dr. Syed's report is a part of Exhibit 4F of the record. That exhibit constitutes records from Lakeshore Behavioral Health.

depression; the mental status examination found that his memory was intact, and he presented without depression, anxiety, or agitation (T352).

### Treatment for Depression and Anxiety

In January of 2008, plaintiff told the intake therapist at Lakeshore Behavioral Health that he took Prozac, Risperdal, and Ambien CR, as prescribed by his primary healthcare provider. (T234). Plaintiff's primary care doctor, David S. Clifford, MD, was the physician who treated plaintiff's anxiety and depression symptoms. (T54-55). By February of 2009, plaintiff had not taken his medications for several months, and had failed, on multiple occasions, to follow through with recommendations to attend counseling (T333); he told the nurse practitioner at his Dr. Clifford's office that he was feeling "okay". He was advised at that time to follow through with counseling, and to follow up with the Dr. Clifford either within six months, or as otherwise needed. (T334). No further prescriptions were requested or supplied to treat plaintiff's mental symptoms. (id.). Four months later, although he reported "trouble functioning in life", he was still off of his prior medications and had still not followed up on the referral to counseling. (T330). He was again advised to follow up with counseling, and to contact VESID to help him with job training and his psychiatric condition. (T331). In August of 2009, plaintiff returned to Dr. Clifford for a six-month follow-up on his psychiatric conditions (T327).[12] He was still off of medications for these conditions. (id.). He was given a prescription for Citalopram for his depression (id.), and advised to follow up in either two months, or as otherwise needed. (T328). The following month he returned to have his ears cleaned. Around that time, it appears that he was prescribed Atarax on an as-needed basis for anxiety symptoms.[13] (T376). In October of 2009 his Citalopram dosage was

---

[12] In addition to assessment of neuropathy in his upper extremities and GERD (T327).
[13] The September 2, 2009 Progress Note of ANP Linda Blazier advises plaintiff to "Continue Atarax tab … for

increased. (T323). When he returned in December, he reported that he was "feeling pretty good" and feeling "much better with the citalopram". (T320). Since the Atarax was making him drowsy, however, and since he was considered to have more anxiety than depression he was told to stop taking the Atarax, and his anti-depressant was changed from Citalopram to paroxetine. (T321). The new drug was chosen since it would be able to address "depression, anxiety [and] social anxiety disorder". (id.). Plaintiff was advised to follow up in one month. (id.). The new drug was effective, and, at his April 2010 follow-up appointment, plaintiff reported "feeling great". (T318). There was no indication of any further psychiatric change at his June 14, 2010 appointment, although plaintiff was noted to still be on paroxetine. (T314).

One month later, at his hearing before ALJ Pang, plaintiff reported that "[m]entally I feel more stable, because we tried different things" (T45-46). He defined "stable" as feeling the same as he was when he filed his claim in May of 2008. (T42-43). He was not seeing any psychiatrists or counselors since he was able to use the coping skills he learned from "going through groups" in addition to his prescription medication (T55).

### Degenerative Joint Disease of the Right Shoulder

Plaintiff's documented shoulder conditions date back to 2006,[14] at which time he had a right should arthroscopic stabilization procedure (T226). About three months later, he was making significant improvement and had a nearly full range of motion; he reported that he was "doing fairly well" (T225). Five months post-arthroscopy, plaintiff reported increasing stiffness

---

anxiety"); this note is the first reference to a prescription for the medication.

[14] As noted above, plaintiff filed his present application for disability benefits in May of 2008, and these records thus pre-date the application. I note, however, that the SSA regulations require the acquisition of medical records "for at least the twelve months preceding the month in which an applicant files his application *unless there is a reason to believe that development of an earlier period is necessary.*" 20 C.F.R. §416.912(d) (*emphasis* added). It appears that the SSA believed that the acquisition and inclusion of these records in the administrative record was necessary.

and pain, and on physical examination his range of motion was reduced in comparison with prior examinations, with plaintiff being able to forward elevate and abduct to only about 110º before having tightness (T224). On September 21, 2007, his treating orthopedist, Ted E. Szarzanowicz, MD, found that his abuduction and ability to reach overhead was limited (T221). At that time, Dr. Szarzanowicz opined that:

> "[H]e could do his work-related activities as long as he limits his overhead lifting and limits lifting with his right upper extremity to about 20 lbs. He will likely have difficulty with this shoulder secondary to the arthritis he has, but he should be able to do meaningful employment, with lighter duty activities being most likely achievable." (id.).

At plaintiff's last appointment prior to his alleged onset date, in November of 2007, the orthopedist noted that plaintiff had "a fairly reasonable motion with lifting the right arm in the overhead plane with forward elevation and abduction. Internal rotation behind his back continues to be tight and crepitation is noted in the shoulder with active and passive motion. Strength is reasonable, but irritable" (T220). Plaintiff was advised to finish physical therapy and "progress activities as tolerated". (id.).

### Plaintiff's Description of Right Shoulder Condition

In the Function Report plaintiff submitted in support of his SSI application, plaintiff indicated that he "[c]annot lift because of rt. Shoulder" (T150).

In July of 2008, plaintiff was evaluated by Internal Medicine Consultative Examiner ("CE") Jacob Piazza, MD. At that time, plaintiff reported that he continued to have aching pain when trying to lift his shoulder above shoulder level, and that he had problems using his shoulder for carrying, reaching, and grasping (T260).

The next time plaintiff describes his condition is on January 23, 2009, when he reported to a new orthopedist, Paul Paterson, MD (T340). At that time, he complained that he had weakness, as well as clicking and popping in his shoulder, with sharp pain which he believed "may have gotten worse" (id.). A couple of weeks later he told his primary care doctor that he had been off all medications[15], that he needed surgery, but that he was afraid to have it done (T333-34). Plaintiff's next description of his shoulder complaints was on June 1, 2009 (T345). He had canceled his surgery, and, although he complained of shoulder pain, was "willing to live/work with the pain for now" (id.). Three weeks later he went to Dr. Clifford complaining of shoulder pain, reporting that his "shoulder is flaring up" and that he was afraid to have surgery (T330). On the last occasion he sought treatment for his shoulder condition, on July 20, 2009, he complained that his shoulder was still bothering him, with intermittent soreness aggravated by use, and alleviated by rest (T348).

At his July 23, 2010 hearing, plaintiff reported that his "shoulder's shot" and that he was physically worse than when he filed his application in May of 2008 (T42-43). He reported that his pain level varied, from between a 4 to 6 out of 10 on some occasions to 9 out of 10 if he exerts himself (T38-39). Taking milk out of the refrigerator would "cause a sharp shock in there" (T37). With respect to functioning, plaintiff testified that he had trouble with overhead reaching (T38).

**Medical Provider's Observations of Right Shoulder Condition**

Plaintiff went to his original treating orthopedist, Dr. Szarzanowicz, in April of 2008, approximately one month after his alleged disability date (T219). At that time Dr. Szarzanowicz noted that plaintiff was able to forward elevate and abduct his right arm. He could

---

[15]  The narrative report indicates that plaintiff had stopped all other medications, but a section on "current medications" does indicate, at a minimum, that plaintiff had been prescribed Proventil, oxaprozin, and Vitamin D.

10

hear crepitation in the shoulder. The doctor found that plaintiff's overall strength was reasonable. (id.).

Four months later, plaintiff was evaluated by the CE. The CE found that plaintiff was limited with respect to abduction (to 90º) and forward elevation (to 110º) with full strength in plaintiff's upper and lower extremities (T262). He concluded in his medical source statement that:

> "[H]e has moderate to marked limitation for lifting his arm above shoulder level. He has a moderate limitation for reaching, pulling, carrying, and lifting with the right upper extremity" (T263).

Plaintiff was next seen for an evaluation of his right shoulder by an orthopedist, Paul Paterson, MD, in January of 2009 (T340-43). The doctor found that his right shoulder motor strength was normal, with flexion at 110º and abduction at 90º (T342). He noted tenderness along the glenohumeral joint. (id.). At that time, the doctor determined that the plaintiff "has incapacitating glenohumeral arthritis and has failed all reasonable nonsurgical treatments" and offered surgical intervention as an option (id.). With surgery planned and plaintiff instructed to return to the office after surgery for post-operative care, the doctor noted that the plaintiff was unable to work until further notice (T342). On February 2, 2009, plaintiff had a CT scan of his shoulder, which was read as "[m]ild to moderate glenohumeral joint arthrosis" and "AC joint arthrosis" (T344).

At plaintiff's next orthopedic shoulder exam on June 1, 2009, plaintiff had no pain or tenderness on examination, and had full motor strength. Flexion increased to 120º, and abduction remained at 90º (T346). His right shoulder condition was considered unchanged. (id.).

Plaintiff's shoulder condition remained relatively unchanged at his July 20, 2009 visit (T349). At that time, Dr. Paterson noted that plaintiff intended to continue symptomatic

treatment, returning on an as-needed basis. The doctor further opined that "he is totally disabled from his present occupation" (T350), which had been noted as "Construction/Extraction" (T348)(capitalization omitted). Dr. Paterson cleared plaintiff to "return to work full duty" at an October 2009 evaluation of plaintiff's left[16] upper arm and elbow (T353).

### Treatment of Right Shoulder Condition

As discussed above, plaintiff's shoulder complaints began before his March 2008 disability onset date. Prior to that time, he had had surgery, and was receiving corticosteroid injections and was prescribed Lortab tablets in conjunction with therapy (T221). The plan was for plaintiff to complete his therapy program, "progress activities as tolerated" and receive, if necessary, repeat injections every four to six months (T220). This plan of treatment with his original orthopedist continued after the alleged disability onset date, through April 2, 2008 (T219).

On April 2, 2008, plaintiff received another corticosteroid injection, and it was planned that plaintiff would return for a reassessment in four to six months (T219). Plaintiff never returned.

On January 23, 2009, plaintiff presented to Dr. Paterson and reported that the prior surgery did not help, that the cortisone injection helped only for a couple of weeks, and that physical therapy helped minimally (T340). The doctor noted that plaintiff had been taking Lortab. (id.). Since plaintiff had failed at all nonsurgical treatments, the doctor offered "surgical . . . resurfacing [of] both his humeral head and glenoid" as an option (T343).

By June 1, 2009, plaintiff had cancelled his surgery (T345) and elected to "live/work" with his pain. (id.) Plaintiff was given a prescription for Celebrex, advised to

---

[16] The identified location of injury is right upper arm and elbow, although the remainder of the examination addresses the left upper extremity (T351). The record notes plaintiff's history of right shoulder pain.

undertake "activities as tolerated" and to perform home exercises. He was also advised to return for follow-up in six to eight weeks. It was noted that plaintiff asked for Lortab, but that he was told to ask his primary care doctor for that "until such time that we perform surgery on him" (T347). Plaintiff then presented to his primary care doctor on June 17, 2009, stating that his shoulder was "flaring up" and that he was afraid of surgery. He was referred back to the orthopedic surgeon for pain management, although a lidocaine topical film was prescribed at that time (T330).

Plaintiff returned to the orthopedic surgeon on July 20, 2009 with continuing shoulder soreness (T348). At that time, he decided not to go forward with the suggested surgery, and the plan was for him to continue with his symptomatic treatment (T350). Although records do indicate that plaintiff continued using the lidocaine topical film for his shoulder discomfort after that date (*See, e.g.*, T326, T323, T320, T318, T316, T314), it appears that he stopped taking the Celebrex and Lortab sometime after July 20, 2009 (*See, e.g.*, T326, T323, T320, T318, T316, T314).

### Carpal Tunnel Syndrome

Plaintiff began complaining about numbness and tingling into his hand in August of 2009 (T327). He had a normal EMG/NCS[17] of the left upper extremity (T292). He then returned to Dr. Paterson, the last orthopedist who had treated him for his shoulder condition. He reported that his hand pain was worse in the morning, and that it would awaken him at night (T351). Medication helped with it. (id.). Although the orthopedist did not have the results of the EMG/NCS study, plaintiff was diagnosed with carpal tunnel syndrome and left ulnar neuropathy (T353). He was splinted for 23 hours per day, with a plan for re-evaluation in six to eight weeks.

---

[17] Nerve Conduction Study (T293). *See also*, Stedman's Medical Dictionary, (27th Ed.) p.582, explaining "EMG" as an abbreviation for electromyogram.

(id.). When he returned in November, he reported a 50-60% improvement in symptoms (T355). At that time, he was told to continue with his splint for an additional four weeks, and then to wean himself off of it (T356). There is no further indication of treatment in the record.

### Chronic Obstructive Pulmonary Disease

In April of 2010 plaintiff went to his primary care physician complaining of a three-month history of shortness of breath and coughing up phlegm (T318). He was diagnosed with tobacco use disorder, chronic obstructive pulmonary disease ("COPD"), cough, and a right upper lobe wheeze (id.). He was told to stop smoking, and was prescribed Chantix for that purpose. (id.). A couple months later he complained of respiratory symptoms, and was diagnosed with an infection. Plaintiff was instructed to call if he did not improve within seven to ten days; there is no record of plaintiff returning for this reason. It was noted that he had failed at Chantix (T315).

### Education and Work History

Plaintiff completed his GED sometime in the 1980's (T142).

The date plaintiff last worked is unclear. Plaintiff reported, in his Disability Report form, that he stopped working due to problems with a supervisor on March 1, 2008—which he also claimed as his disability onset date (T136). He testified that his last job was sometime at the "end of the season" or year of 2004, as a radiator assembler and packer (T33, T176), although there is some indication that he was working in lawn maintenance in 2007 (T200).

Plaintiff worked longest as a construction worker and demolition worker (T137).

### Activities of Daily Living

In the Function Report submitted in support of his application, plaintiff reported that he spent his days watching television, eating, and napping (T146).

14

Plaintiff also stated that he cared for his father, in conjunction with a home health aide. Plaintiff told his psychiatrist, one month after his alleged onset date, that he "is unable to work now since he is caring for his father" (T237). He also feeds and cares for his cats and fish (T146).

Plaintiff does household chores such as laundry with help (T34, T148). He gets around by walking, public transportation, and friends. He is able to go out alone (T148), and there is some indication that he is able to drive (T34), except for the fact that he does not have a car (T34).

Plaintiff continued with computer and resume training between October 2007 (T143) and the time of his April 2008 evaluation by his psychiatrist (T234).

### Vocational Expert Testimony

ALJ Pang heard the testimony Vocational Expert ("VE") Victor Alberigi on July 23, 2010 (T114,T29-56). In evaluating plaintiff's prior jobs, the VE noted that their exertional classifications were medium or heavy duty, with plaintiff's last recorded job as a construction worker being rated as heavy duty (T45-T48). The skill levels for these prior jobs ranged from unskilled (T45) to semi-skilled (T46). Plaintiff's construction work job was considered semi-skilled (T46).

ALJ Pang described the following hypothetical worker to the VE:

"First, if you consider the individual of the same age, education, work experience as the claimant. This individual would be able to perform light work as defined in our regulations. This hypothetical individual would only occasionally be able to push or pull with the right upper extremity. Only occasionally reach with the right upper extremity with it fully extended. [N]ever reach overhead with the right upper extremity. No limitation with the left upper extremity. This hypothetical individual would never be able to climb ladders,

> ropes, or scaffolds [and] should avoid all exposure to unprotected
> heights. This hypothetical individual would frequently be able to
> handle and finger. This hypothetical individual would be able to
> understand, remember, and carry out simple instructions, make
> judgments on simple work-related decisions, interact appropriately
> with supervising coworkers in routine settings and respond to usual
> work situations and changes in a routine work setting. However, this
> hypothetical individual would require work that is isolated from the
> public with only occasional supervision and only occasional
> interaction with coworkers" (T49).

ALJ Pang then asked the VE whether such a worker would be able to perform "any of the claimant's past work" (T49). The VE said no. (id.).

When ALJ Pang asked the VE if he could identify any other occupations in the national or regional economy that such a worker could perform, the VE asked for clarification on a couple of points (T49-50). He confirmed that the worker was right-handed (T49), and asked about reaching and handling and fingering (T49-50). ALJ Pang then clarified his hypothetical by stating that the worker would be able to use his right upper extremity to reach without limitation, so long as the arm was not used at its fullest length (T50). The worker's ability to reach with the arm extended its fullest length would be limited to occasional use. (id.). The VE confirmed that the worker would be able to reach for things at a table, unless it was for things at some distance. (id.).

With respect to interaction with others, the VE asked whether the worker would be able to be in the same room with other people, with only occasional active interaction. ALJ Pang advised that the worker could have only superficial contact, but no direct interaction (T51).

Based on these hypothetical limitations and abilities, the VE identified three occupations that the hypothetical worker could perform: cleaner, after-hours cleaner, and small bench assembler (T52-53). In the VE's opinion, the after-hours cleaner was the best fit, since it did

not involve any contact with the public or even occasional contact with supervisors and coworkers (T52).

Two more hypothetical limitations were posed to the VE. One, from ALJ Pang, was that the "hypothetical individual would not be able to respond to usual work situations or to changes even in routine work settings on a consistent basis" (T54). The VE testified that there would be no jobs the hypothetical worker with these additional limitations. (id.). Plaintiff's counsel then asked if there would be any jobs for the originally-described hypothetical worker if he had the additional limitation of having to recline for one hour every day, beyond taking work breaks (T54). The VE testified that there would be no jobs to accommodate such a person. (id.).

### ALJ Pang's Decision Dated July 30, 2010

Shortly after the administrative hearing, ALJ Pang issued his decision, finding plaintiff to be not disabled and therefore not entitled to SSI benefits (T14-24).

As discussed above, ALJ Pang found that plaintiff's severe impairments included degenerative joint disease of the right shoulder, carpal tunnel syndrome, COPD, mood disorder, and anxiety disorder (T16). He determined that plaintiff's GERD, hypertension, and obesity were not severe impairments (id.).

ALJ Pang, as part of the five-step disability determination process, also considered whether any of the impairments, or any combination of them, constituted a listed impairment under 20 CFR Part 404, Subpart P, App. 1. At this step, ALJ Pang found that, under Listing 1.02, dealing with major dysfunction of a joint, plaintiff did not have an extreme loss of function of both extremities (T17).

In evaluating plaintiff's anxiety and depression, ALJ Pang considered the criteria of

listings 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders) (T17). He determined that plaintiff did not have marked restrictions in two of the four functional-limitation criteria required under paragraph "B" to either listing (T17). The four paragraph "B" criteria are the same for the listings in question: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (id.).

ALJ Pang found mild restrictions in claimant's activities of daily living due to symptoms of lack of interest, reduced energy, and periods of personal care neglect (T17). The ALJ also found that plaintiff "is generally able to take care of his personal needs, prepare meals, shop, and perform light household chores" (id.). In making these findings, ALJ Pang relied upon, by way of citation to, plaintiff's counselor's and psychiatrist's records from Lakeshore Behavioral Health (Exhibit "4F" at T227-38), the CE's report[18] (Exhibit "8F" at T260-63), and plaintiff's own Function Report concerning what he can and cannot do. (Exhibit 3E at T145-53).

With respect to the social functioning and the concentration, persistence or pace criteria, ALJ Pang found plaintiff to have moderate difficulties (T17). Within the context of social functioning, ALJ Pang noted plaintiff's self-reported problems with anxiety, social withdrawal, anger-related assaults and outbursts, and difficulty getting along with others, including neighbors, family, and co-workers. (id.). He also noted the absence of evidence that plaintiff would be unable to relate appropriately with others, although he believed that reduced work-place interactions would be beneficial. (id.). ALJ Pang contrasted plaintiff's self-reported problems with

---

[18] Medical Consultative Examiner Jacob Piazza addressed plaintiff's social history as well as activities of daily living on the second page of his internal medicine examination report (T261). With respect to activities of daily living, he noted that plaintiff "does the cooking, cleaning, laundry, and shopping. He can shower and dress himself. Activities are watching TV, listening to the radio, and reading" (id.).

concentration, persistence or pace with mental status examinations in which plaintiff's mental health providers as well as the PE found no deficits in attention and concentration, and mild impairment in recent and remote memory. ALJ Pang relied upon the records of plaintiff's counselor's and psychiatrist's records from Lakeshore Behavioral Health (Exhibit "4F" at T227-38), the PE's report (Exhibit "5F" at T240-43), and plaintiff's own Function Report. (Exhibit "3E" at T145-53). ALJ ultimately found that plaintiff was "capable of attention and concentration sufficient for the performance of simple tasks" (T17).

ALJ Pang also considered paragraph C criteria and determined that plaintiff had not suffered episodes of decompensation (T18).

ALJ Pang next evaluated plaintiff's RFC (T18). He first detailed allegations in plaintiff's filings, concerning plaintiff's depression, anxiety, and reduced ability to lift and use the right shoulder, noting plaintiff's alleged loss of interest in activities, finishing projects, social withdrawal, and forgetfulness which extends to personal care. (id.) He noted references to plaintiff's ability to heat prepared meals and perform light household chores. (id.). He then reviewed plaintiff's testimony at the administrative review hearing (T19). From the plaintiff's testimony concerning his right shoulder, the ALJ noted that plaintiff claimed to still have pain and reduced range of motion, was not able to lift his right arm overhead, and has limitations with respect to reaching or lifting with his right arm. (id.). With respect to plaintiff's testimony concerning his claimed mental impairments, the ALJ noted that plaintiff claims that his depression episodically prevents him from wanting to leave his room or bed, and affects his personal care, with episodes occurring between one and a half to two months at a time, and lasting three or more days. (id.). The ALJ also noted plaintiff's claims that he has had to leave events or stores due to

panic attacks, that plaintiff does not like people and is suspicious of them. (id.).

      With respect to other aspects of plaintiff's testimony, ALJ Pang noted that plaintiff considered his shoulder symptoms to be worse at the time of the hearing in comparison with when the SSI application was made, and that his depression and anxiety symptoms had stabilized because of the presence of a support system. ALJ Pang reviewed plaintiff's testimony concerning his drug and alcohol use, and plaintiff's current use of medication to treat depression and physical complaints (T19).

      After reviewing the allegations made in plaintiff's submissions and testimony, ALJ Pang concluded that, while plaintiff's medically determinable impairments "could reasonably be expected to cause" his alleged symptoms, plaintiff's statements concerning the intensity, persistence, and limiting effects of them were not entirely credible (T19).

      ALJ Pang then proceeded to discuss the objective medical evidence, including conflicting medical history evidence concerning plaintiff's drug and alcohol use (T20-21); non-compliance with psychological counseling recommendations and missed appointments (T21); and lack of mental health care treatment since April 2008 (id.). ALJ Pang concluded that the medical evidence showed significant functional limitations in plaintiff's use of the right shoulder, a history carpal tunnel syndrome and COPD, with occasional use of a bronchodilator (T22). He further concluded that the evidence showed limitations in exertion levels, fingering and handling, and drowsiness. He finally concluded, with respect to the medical issues, that the physical limitations were reflected in the RFC finding. (id.).

      With respect to the mental impairments, ALJ Pang noted the objective findings on mental status examination, characterizing the findings as being "fairly mild" and "showing only

20

some abnormalities of mood and affect" (T22). ALJ Pang commented on the large gaps in

treatment during which plaintiff was neither taking medication nor receiving counseling,

concluding that "[t]his treatment history is inconsistent with symptoms as debilitating as alleged

by the claimant" (id.). ALJ Pang further commented on plaintiff's inconsistent symptom reporting,

noting that plaintiff complained of suffering from panic attacks only at the psychiatric consultative

examination and during his administrative hearing. (id.). ALJ Pang found that "the weight of the

evidence supports a finding of significant limitations in the claimant's work-related mental

abilities due to these impairments" (id.). Since ALJ Pang found plaintiff's credibility to be

lessened by inconsistencies in plaintiff's treatment history, symptom reporting, and inconsistent

reporting of drug use, he noted that he was incorporating the significant mental limitations into his

RFC "to the extent [they are] credible and supported by the evidence" (id.).

ALJ Pang made additional credibility findings with respect to plaintiff's last

orthopedic surgeon, the consultative medical and psychiatric examiners, and the state agency

medical and psychological consultants (T22).

Dr. Paterson's records contained two documents containing an ultimate conclusion

on disability, and a letter from Dr. Paterson, submitted by plaintiff's counsel, likewise contained

such a conclusion (T286-90, T22). ALJ Pang noted that the January 2009 record indicated that

"claimant is unable to work until further notice", and that a July 2009 record as well as the July

2009 letter stated that plaintiff had "a total disability at this time from his present employment"

(T22). ALJ Pang gave little weight to those portions[19] of the doctor's records because the medical

evidence did not support the proposition that plaintiff's limitations "preclude the performance of

---

[19]  ALJ Pang did not state that he was giving little weight to any of the doctor's opinions; he does rely upon the doctor's
records elsewhere. *See, e.g.,* citation to Exhibit 18F (Medical Evidence of Record dated 1/23/2009 to 11/20/2009,
from Paul Patterson, MD, T338-358) at T20).

all work activity" (T22).

ALJ Pang gave great to the opinions of the consultative medical and psychiatric examiners, and noted that his determination of RFC was consistent with their opinions (T22).

In addressing the credibility of the state agency medical and psychological consultants, ALJ Pang stated that he gave some weight to their opinions. He further noted that he found plaintiff to have greater limitations than they did based on his independent assessment of evidence, including evidence unavailable to them (T22).

ALJ Pang's resulting RFC assessment is as follows:

"I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant would only be able to occasionally pull or pull with the right upper extremity, occasionally reach with the right upper extremity fully extended, and never reach overhead with the right upper extremity. The claimant would have no limitation with the left upper extremity. The claimant would ever be able to climb ladders, ropes or scaffolds, would be able to frequently handle and finger, and should avoid all exposure to unprotected heights. The claimant would be able to understand, remember and carry out simple instructions, make judgments on simple work-related decisions, interact appropriately with supervisors and co-workers in a routine work setting, and respond to usual work situations and changes in a routine work setting, however the claimant would require work that is isolated from the public with only superficial and no direct interaction with the public and only occasional supervision and occasional interaction with co-workers" (T18).

After finding that plaintiff could not return to any of his past relevant work (T23), ALJ Pang proceeded to determine where there were any existing jobs in significant numbers in the national economy that plaintiff could perform. (id.). ALJ Pang referenced the VE's testimony that, given plaintiff's additional limitations, a worker such as plaintiff would be able to perform jobs such as cleaner, after-hours cleaner, and small product assembler (T24). He concluded that

plaintiff was not disabled, since, based on this testimony, and "considering the [plaintiff's] age, education, work experience, and residual functional capacity, the [plaintiff] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy" (id.).

## ANALYSIS

The scope of judicial review of the Commissioner's decision is limited. This court may not try the case de novo, nor substitute its findings for those of the Commissioner.   See Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984). Rather, the Commissioner's decision is only set aside when it is based on legal error or is not supported by substantial evidence in the record as a whole.   See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1988).

On a district court's review of an SSI or DIB benefits determination, the first inquiry is whether the correct legal principles and standards were applied, followed by an inquiry into whether the determination is supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986-87 (2d Cir. 1987); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). If an ALJ has failed to act in conformity with the regulations promulgated under the Social Security Act, reversal is warranted. Townley, 748 F.2d at 112-14.

The Social Security Act states that "the findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. §405(g). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion". Consolidated Edison Co. of New York, Inc. v. NLRB, 305 U.S. 197, 229 (1938). Rather, the Commissioner's decision is only set aside when it is based on legal error or is not supported by substantial evidence in the record as a whole.   See Balsamo, 142 F.3d at 79. If supported by

substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the Court's independent analysis of the evidence may differ" from that of the Commissioner. Martin v. Shalala, 1995 WL 222059, *5 (W.D.N.Y. 1995).

The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §1382c(a)(3)(A). The impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy" §1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

1.  The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.  If not, the Commissioner considers whether the claimant has a 'severe impairment' which limits his or her mental or physical ability to do basic work activities.

3.  If the claimant has a 'severe impairment,' the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.  If the impairment is not 'listed' in the regulations, the Commissioner then asks whether, despite claimant's severe impairment, he or she has [("RFC")] to perform his or her past work.

5.  If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could

perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); *See* 20 C.F.R. §§404.1520(d), 426.920(d). The "regulations . . . limit the Commissioner's burden at step five. *See* 20 C.F.R. [§] 404.1560(c) . . . The commissioner's step-four RFC determination (with the claimant bearing the burden of proof) now controls at both steps four and five.... The Commissioner applies the RFC determination from step four to meet his burden at step five. Using the claimant's RFC, the Commissioner must then show at step five that 'there is other gainful work in the national economy which the claimant could perform.'" Spain v. Astrue, 2009 WL 4110294, *3 (E.D.N.Y. 2009).

Plaintiff argues that the ALJ's RFC assessment was flawed (*see*, Plaintiff's Memorandum of Law [7-1], pp. 10-18) and that the vocational expert's testimony was based upon the flawed RFC assessment (id. at pp. 18-19). Plaintiff claims that the Commissioner has not met his burden at the fifth step of the disability determination process (id. at p.19) , and that the Court should either determine that he is entitled to benefits, or remand this matter for further administrative proceedings *See*, Complaint [1], p.2.

Plaintiff asserts the following errors in formulating the RFC: 1) that the ALJ failed to develop the record concerning plaintiff's physical or mental impairments by re-contacting treating physicians; 2) that the ALJ failed to address plaintiff's limitations in coping with stress as required under SSR 85-15; 3) that the RFC finding that plaintiff "would be able to interact appropriately with co-workers and supervisors" is not supported without evidence that he could do so on a sustained basis; 4) that the appropriate legal standards were not applied in assessing plaintiff's credibility in evaluating the intensity, persistence, and limiting effects of his symptoms; and 5) that the RFC, as phrased, is internally inconsistent. *See*, Plaintiff's Memorandum of Law

25

[7-1].

In the cross-motion for judgment on the pleadings, the Commissioner argues that the decision "is supported by the evidence and is based upon the application of the correct legal standards" Commissioner's Memorandum of Law [15], p.1.

## A.     Development of the Record

Plaintiff argues that there is no treating or examining source opinion of specific functional limitations. Plaintiff's Memorandum of Law [7-1], p.12. He specifically argues that there are no properly-considered "function-by-function findings by a medical source of physical limitations", and that the PE provided vague opinions, not specific to the mental demands of work, as delineated in SSR 85-15. (id.). The Commissioner asserts that the duty to re-contact arises when a medical source is inadequate to determine whether the claimant is disabled and information is needed for the RFC determination. Commissioner's Memorandum of Law [15], p. 17. He further argues that, since the medical opinions were sufficient to make the ultimate disability finding in this case, there was no need to re-contact any treating physicians. Commissioner's Memorandum of Law [15], pp. 17-18.

Plaintiff had, prior to his alleged date of disability onset,[20] seen orthopedist Dr. Thaddeus Szarzanowicz for his right shoulder condition (T219-26). This doctor had, upon plaintiff's request, provided an opinion as to plaintiff's abilities and limitations in 2007 (T221). At plaintiff's last appointment with this doctor, the doctor advised plaintiff that he should "continue activities as tolerated as best as possible" (T219). Plaintiff's next orthopedist, Dr. Paul Paterson, examined the plaintiff on January 23, 2009 (T282). Within the context of advising and preparing

---

[20] *See* fn.14, above, for a discussion concerning the SSA's guidance on the acquisition (and thus reliance upon) pre-application or pre-onset medical evidence.

plaintiff for shoulder surgery, he noted that plaintiff was "unable to work until further notice" (id.). On July 20, 2009, the doctor noted that plaintiff was "totally disabled from his present occupation" and provided a note on the same day that plaintiff "cannot return to work. He is a total disability at this time from his present employment" (T287). In October of 2009, while evaluating plaintiff's carpal tunnel symptoms, Dr. Paterson released plaintiff to "return to work full duty" (T353).

## 1.    Dr. Paterson

ALJ Pang gave little weight to Dr. Paterson's January and July 2009 disability opinions (T22). Plaintiff argues that the ALJ should have obtained a more detailed assessment of limitations from that doctor.

The Commissioner argues that a treating physician's ultimate opinion on disability is not entitled to significant weight. *See* Commissioner's Memorandum of Law [15], p.19 at fn5. This is correct. *See* Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). In fact, a conclusory statement concerning disability, made by a treating physician, does not constitute a "medical opinion" in any event. 20 C.F.R. §404.1527(e); Earl-Buck v. Barnhart, 414 F.Supp.2d 288, 293 (W.D.N.Y. 2006).

A medical source's opinion that does not address every function with respect to physical limitations is not invalid or insufficient. A function-by-function analysis is unnecessary: a medical source's characterization of a claimant's limitations as "moderate", for example, is enough to support a finding that the claimant is limited to "light" work. *See, e.g.*, Burnette v. Colvin, 564 Fed.Appx. 605, 608-09 (2d Cir. 2014) (Summary Order). Furthermore, there is no duty to re-contact a treating physician "to obtain a function-by-function analysis of [p]laintiff's impairments" where consultative physicians assess a plaintiff's functional limitations and provide

an opinion on them. <u>Grogg v. Commissioner of Social Security</u>, 2014 WL 1312325 *7-8
(N.D.N.Y. 2014). Additionally, even where a treating physician does not provide a specific
function-by-function assessment, where the record is "extensive enough to support an informed
residual functional capacity finding by the ALJ, remand is not appropriate". <u>Leonard v. Colvin</u>,
2014 WL 1338813, *11 (W.D.N.Y. 2014).

   Plaintiff cites to <u>Peed v. Sullivan</u>, 778 F.Supp. 1241 (E.D.N.Y. 1991) for the
proposition that an ALJ is obligated to request an assessment of plaintiff's limitations from his
treating physicians. Plaintiff's Memorandum of Law [7-1], p.14. In <u>Peed</u>, the court found that
"when the claimant appears pro se, the combined force of the treating physician rule and of the
duty to conduct a searching review requires that the ALJ make every reasonable effort to obtain . .
. a report that sets forth the opinion of that treating physician as to the existence, the nature, and the
severity of the claimed disability" Subsequent courts have found that this obligation varies,
depending on the state of the medical record evidence as well as the status—represented or
unrepresented—of the plaintiff. *See, e.g.*, <u>Alford v. Colvin</u>, 2013 WL 6839554, *8-9 (N.D.N.Y.
2013).

   Plaintiff was represented throughout the administrative proceedings, however,
from the earliest juncture (T75-76). Plaintiff's counsel, on a number of separate occasions,
submitted Dr. Paterson's total disability finding letters and records to the administration (T278-85,
T286-87, T288-90, T341-58). Plaintiff's counsel relied upon Dr. Paterson's total disability finding
in her Pre-Hearing Memorandum (T188-89). Plaintiff was therefore not under the same
disadvantage that a *pro se* claimant would be.

   As discussed above, plaintiff's original orthopedist, Dr. Szarzanowicz, opined in

September 2007 that plaintiff would have to limit his overhead lifting and limit weight generally to about 20 lbs, but that he should be capable of meaningful, light duty employment (T221). At the time, the doctor noted limited abduction and overhead reaching (id.). Similarly, the CE found limited abduction and forward elevation on August 26, 2008 (T262). The CE found moderate to marked limitation with lifting above shoulder level, and moderate limitations with respect to reaching, pulling, carrying, and lifting. (id.). Moving forward in time, when plaintiff saw his second orthopedist, Dr. Paterson, his physical examination was again similar, with limited abduction and flexion (T342). Plaintiff's right shoulder motor strength was weak at the time that the first orthopedist limited him to about 20 lbs (T221), but was thereafter consistently "reasonable" or "normal", from November of 2007 through July 20, 2009, the last date on which plaintiff's right shoulder was examined by a treating physician. (See, e.g., T220, T219, T262, T342, T350). Under these circumstances, the ALJ was not required to re-contact plaintiff's treating physicians for any further assessment of functional limitations.

## 2.      Dr. Ryan

Plaintiff also asserts that the PE Dr. Ryan's functional limitation assessment was vague, suggesting by way of footnote that the ALJ should have obtained an assessment discussing all of the factors in found in SSR 85-15. *See* Plaintiff's Memorandum of Law [7-1], p.12. The Commissioner argues generally that there was no duty to recontact, since the record does contain sufficient opinions concerning plaintiff's ability to work (Commissioner's Memorandum of Law [19-1], pp.17-18), including an opinion by Dr. Ryan about plaintiff's ability to work (id.).

SSR 85-15, entitled "*Capability To Do Other Work—The Medical-Vocational Rules As A Framework For Evaluating Solely Nonexertional Impairments*," was intended to

"clarify how regulations and exertionally based . . . rules in Appendix 2" provide a framework for decisions concerning persons who have only nonexertional limitation(s) of function" SSR 85-15, 1985 WL 56857, *1. The historical section of that document describes how the table rules are based on exertional capacities, and then points out that they do not "direct conclusions of disabled or not disabled" in and of themselves. (id.). It directs that "[c]onclusions must, instead, be based on the principles in the appropriate sections of the regulations, giving consideration to the rules for specific case situations in Appendix 2" (id.). Thus, it must be the regulations that govern.

Nor does SSR 85-15 apply to cases such as plaintiff's. By its own description, it is meant to address the situation in which a claimant claims disability solely due to non-exertional impairments. *See* SSR 85-15, 1985 WL 56857, *1. The Second Circuit has held that SSR 85-15 does not apply in cases in which both exertional and non-exertional impairments are alleged. *See* Roma v. Astrue, 468 Fed.Appx. 16, 20 (2d Cir. 2012) (Summary Order)(noting that failure to evaluate ability to cope with stress as directed by SSR 85-15 is not erroneous where exertional and non-exertional impairments are alleged). *See also*, Nosbisch v. Astrue, 2012 WL 1029476, *5 (W.D.N.Y. 2012)(SSR 85-15 inapplicable where both exertional impairments, such as carpal/tarsal tunnel syndrome, and non-exertional impairments, such as anxiety and depression, are involved); Yarington v. Colvin, 2014 WL 1219315, *5 (W.D.N.Y. 2014). For these reasons, I find that the PE's functional limitation assessment was not vague for failing to address all of the factors contained in SSR 85-15.

For these reasons, I conclude that the ALJ was not under an obligation to re-contact plaintiff's physicians to further develop the record.

**B.      The ALJ's Treatment of Plaintiff's Ability to Handle Stress**

Plaintiff also argues that the ALJ failed address his ability to deal with stress on a sustained basis within his RFC, contrary to the dictates of SSR 85-15. Plaintiff's Memorandum of Law [7-1], p.11. The Commissioner responds that the ALJ's RFC determination, by limiting plaintiff to occasional interaction with co-workers and supervisors, and to working with simple instructions and decision-making with little public contact, sufficiently took into account all of the plaintiff's limitations. Commissioner's Memorandum of Law [15], p.17. The Commissioner also obliquely responds to plaintiff's argument by asserting that the ALJ found plaintiff limited to "simple (as opposed to complex) instructions and simple work-related decisions" (id.).

First, and as discussed above, SSR 85-15 does not apply where, as here, both exertional and non-exertional impairments are claimed. *See* Roma, 468 Fed.Appx. at 20.

Second, it is clear that the ALJ did consider plaintiff's stressors and reactions in making his findings and his RFC determination. The ALJ found that plaintiff reported symptoms of anxiety related to getting along with others. (T22). Plaintiff testified that he did not like people (T41), and that he *becomes concerned* that they are going to hurt him (T39). The ALJ, in reviewing the record medical evidence, described plaintiff's difficulties, from an anxiety and social withdrawal standpoint, in dealing with others. In his hypothetical posed to the VE, the ALJ provided that "this hypothetical individual would require work that is isolated from the public with only occasional supervision and only occasional interaction with coworkers" (T49). When the VE asked for clarification on plaintiff's ability to be in the same room with other people, the ALJ advised "only superficial contact with the public. The contact can be around, but no direct interaction with the public" (T51). When the VE identified cleaner as a potential job that could be

31

performed by someone like the plaintiff, he added "This work is typically done in a relatively isolate[ed] or fairly isolated manner and we can even isolate it all the more because the DOT gives us a title of a night, as in nighttime cleaner" and "I'm also going to say that, frankly speaking, that this job[] needs to be looked at as only the after-hours cleaner because it doesn't involve any type of… contact with the public and even occasional contact with supervisors and coworkers. But just to bring it out to another perspective you can be all the more isolated" (T52).

It is clear that, from the record evidence relied upon by the ALJ, the hypothetical posed to the VE, and the findings made by the ALJ, that plaintiff's social anxiety and withdrawal were explicitly addressed.

A reference, in an RFC, to "simple" instructions has not been found to sufficiently address various mental impairments, however. *See*, Karabinas v. Colvin, 16 F.Supp.3d 206, (W.D.N.Y. 2014). In Karabinas it was held that a failure to incorporate a plaintiff's mental limitations into an RFC assessment or in hypothetical questions to the vocational expert warranted remand (id.). An RFC that merely limits to "simple tasks", for example, is insufficient in evaluating a claimant with mental impairment of adjustment order with stress response. *See also*, Sweat v. Astrue, 2011 WL 2532932, *6 (N.D.N.Y. 2011) (failure to make a finding with respect to plaintiff's alleged difficulties in dealing with stress was error; finding was necessary part of RFC). Thus, this sort of restriction alone would not sufficiently address plaintiff's impairments.

I find, however, that the ALJ's restrictions, taken together, do sufficiently take into account plaintiff's anxiety or stress by reducing what plaintiff himself indicated was a cause of his stress: being around other people.

**C.      The ALJ's Finding Concerning Plaintiff's Ability to Interact Appropriately With Others**

Plaintiff claims that "it is inconsistent to find that Sink could both interact appropriately with co-workers and supervisors but also restrict him to occasional supervision and occasional interaction with co-workers". Plaintiff's Memorandum of Law [7-1], pp.10-11. He contends that this inconsistency renders the RFC incomplete or unreliable, and that, "absent clear delineation of Sink's ability to interact appropriately with coworkers and supervisors on a sustained basis, this RFC finding is unsupported" (id.). In response, the Commissioner asserts, without more, that "the ALJ incorporated all of Plaintiff's functional limitations into his RFC, which, as shown, is not 'internally inconsistent.' " Commissioner's Memorandum of Law [15], p.17.

I disagree with plaintiff's first proposition, for it is certainly possible for someone to be capable of appropriate behavior, but, at the same time, to benefit from solitary work. The second proposition deals with burden of proof and evidentiary matters.

The ALJ specifically found, as recited in his decision, that "there is no indication that the claimant is unable to relate appropriately with others, although the claimant would likely benefit from reduced social interaction in the work place environment" (T17). In other words, during the evaluation of RFC, which entails first an assessment of all limitations, the ALJ found that there was no evidence that plaintiff was limited by being incapable of relating appropriately to others. It is plaintiff who must prove that he is unable to interact appropriately with others, since he is the one who must bear the burden of proving his disability. 42 U.S.C. §423(d)(5)(a). An ALJ may "rely not only on what the record says, but also on what it does not say".    Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983). *See also* Petell v. Commissioner of Social

Security, 2014 WL 1123477 *8-9 (N.D.N.Y. 2014) (where record showed an absence of evidence of anger outbursts with medical personnel, ALJ could rely on such absence.)[21]  Therefore, the ALJ could properly rely on the absence of evidence of an inability to properly interact with others.

The record evidence cited by the ALJ in his step 3 determination (T17, citing to Exhibits 3E, 4F, and 5F) do address plaintiff's relationships and examples of plaintiff successfully relating to others. Specifically:

- One of plaintiff's friends helped him with completing the Function Report (3E at T145);

- Plaintiff was living with his family in 2008 (3E at T145; 4F at T229; 4F at T231);

- He uses public transportation (3E at T148);

- He "gets rides" from family or friends when he needs to go somewhere (3E at T146);

- He shops with a friend (3E at T146);

- When he went to a mental health intake appointment, the counselor noted that he was "cooperative" and "engaged in conversation" (4F at T232);

- He was noted to be attending computer and resume building classes (4F at T234);

- He helps care for his father along with a friend (3E at T146); and

- He has reported that his father "often needs [his] assistance" (4F at T234).

For these reasons, the ALJ's finding that there was no evidence of an incapacity to act appropriately is supported by substantial evidence.

---

[21]  The issue in Petell involved the treating physician rule; the general principle would appear applicable in determining RFC as well.

### D.        Assessment of Plaintiff's Credibility

Plaintiff argues that the ALJ's assessment of plaintiff's credibility was flawed for the following reasons: the ALJ's finding that the plaintiff's statements on intensity, persistence and limiting effects of symptoms were not credible is improper where they are disregarded because they "are inconsistent with the residual functional capacity assessment"; the ALJ's finding on plaintiff's reporting of panic attacks was inaccurate; and the ALJ failed to address all of the regulatory factors in assessing credibility. Plaintiff's Memorandum of Law [7-1], pp.15-18. The Commissioner responds that the ALJ properly considered the regulatory factors in evaluating credibility; that the ALJ considered plaintiff's testimony and subjective complaints and concluded that the objective medical evidence did not entirely substantiate his claims, and that his statements were inconsistent with the medical records and testimony; that the ALJ did not completely reject plaintiff's testimony; and that since there is substantial evidence supporting the ALJ's credibility assessment, the assessment should be affirmed. Commissioner's Memorandum of Law [15], pp.21-22.

Plaintiff correctly notes that the ALJ's boilerplate finding, that "[plaintiff's] . . . statements [about his] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" (T19), does not satisfy an ALJ's obligation to evaluate a claimant's symptoms and their effects. Plaintiff's Memorandum of Law [11], p.15. Identical language has been noted by other courts to be illogical. *See, e.g.*, Cahill v. Colvin, 2014 WL 7392895, *23 (S.D.N.Y. 2014); Proper v. Commissioner of Social Security, 2014 WL 7271650, *13 (W.D.N.Y. 2014) (citations omitted); Marte v. Colvin, 2014 WL 5088078, *22, n.49 (S.D.N.Y. 2014). Courts have remanded actions in which such language has been used. *See, e.g.*,

Ferguson v. Colvin, 2014 WL 3894487, *9 (W.D.N.Y. 2014).

However, remand is not granted where it is apparent that the proper legal standard was applied, but the boilerplate was recited. *See, e.g*, Scott v. Colvin, 2014 WL 2818668, *11 (W.D.N.Y. 2014) (Telesca, J.); LaFond v. Astrue, 2013 WL 775369, *13 (W.D.N.Y. 2013) (Telesca, J.); Gladney v. Astrue, 2014 WL 3557997, *12-13 (W.D.N.Y. 2014); Ford v. Colvin, 2013 WL 4718615, *8 (W.D.N.Y. 2014)(Arcara, J./MJ Hugh B. Scott). I find that the ALJ's decision should be reviewed as a whole to determine whether the correct legal standard was applied.

The Social Security Administration's regulations detail the manner in which a claimant's subject complaints or symptoms such as pain are to be evaluated. For SSI claims, this is addressed in 20 C.F.R. §416.929. First, once a medically determinable impairment capable of producing the claimant's symptoms is identified, the ALJ must evaluate the intensity and persistence of the claimant's symptoms to determine how the symptoms limit the claimant's capacity for work. 20 C.F.R. §416.929(c)(1). In addition to objective medical evidence, the ALJ will also consider other evidence. This other evidence may include such relevant factors such as the caimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication to alleviate pain or other symptoms; treatment, for relief of pain or other symptoms; any measures used or have used to relieve pain or other symptoms; and other factors concerning functional limitations and restrictions due to pain or other symptom. 20 C.F.R. §416.929(c)(1).

SSR 96-7, 1996 WL 374186 details how symptoms are assessed: "regulations

provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record" (id. at *2). That Ruling further states that "if an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms." SSR 96-7, 1996 WL 374186, *2.

Plaintiff argues that "the ALJ did not discuss most of the required regulatory factors, such as daily activities or actions he takes to alleviate pain." Plaintiff's Memorandum of Law [7-1], p.16. An ALJ's failure to walk through each of the credibility factors in his decision does not warrant a remand where the bases for his decision can be gleaned from the record. *See* Cichocki v. Astrue, 534 Fed.Appx. 71, 76 (2d Cir. 2013)(Summary Order). Based on this record, I do not find that the ALJ failed to evaluate plaintiff's credibility in accordance with regulatory and SSA rules requirements.

Plaintiff ignores the fact that the ALJ's credibility determination was focused on the plaintiff's alleged mental impairment, and not on the physical impairment. *Compare* Plaintiff's Memorandum of Law [7-1], pp.17-18, with the ALJ's Decision at p.9 (T22). The ALJ considered the following in discounting plaintiff's credibility as to his mental impairments: that plaintiff's symptoms are not borne out by the several different mental status examinations performed on him; that there are large gaps in treatment during which plaintiff did not use medication or pursue

therapy; that plaintiff inconsistently reported his symptoms as anxiety or panic attacks[22] depending on who he was talking to; and that plaintiff has made conflicting drug use and history reports (T22).

For these reasons, I conclude that there is substantial evidence to support the ALJ's credibility finding as to plaintiff.

**E.      Vocational Expert Testimony**

Plaintiff argues that the VE's testimony was invalid because the RFC on which it was based was flawed. Plaintiff's Memorandum of Law [7-1], p.18. Since I find that the RFC is supported by substantial evidence, I conclude that plaintiff's argument as to the VE's testimony is without merit.

**CONCLUSION**

For these reasons, I recommend that plaintiff's motion for judgment on the pleadings [7] be denied, that the Commissioner's motion for judgment on the pleadings [14] be granted.

Unless otherwise ordered by Judge Telesca, any objections to this Report and Recommendation must be filed with the clerk of this court by April 16, 2015 (applying the time frames set forth in Rules 6(a)(1)(C) and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Telesca. A party who "fails to object timely . . . waives the right to further judicial review of [this] decision". Thomas v. Arn, 474 U.S. 140, 155 (1985); Wesolek v. Canadair

---

[22]  Plaintiff attempts to conflate "anxiety" with "panic attack". The two terms are different—one is a state, and the other is self-described as something sudden—an "attack". Furthermore, plaintiff's descriptions of his "panic attacks", featuring a racing heart and sweating (T39), were new descriptions. I therefore reject the proposition that the credibility assessment fails by reason of inaccuracy.

<u>Ltd.</u>, 838 F.2d 55, 58 (2d Cir. 1988).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law, and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. <u>Patterson-Leitch Co v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F.2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection...supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

**SO ORDERED.**

DATED: March 30, 2015

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge
